The next case in our call this morning is case number 108888, Marianna Crywin v. Chicago Transit Authority. This case is agenda number eight on today's call. Counsel may proceed. Thank you, Your Honor. May it please the Court, Counsel. My name is Joseph Ryan and I represent the appellant, Marianna Crywin, in this case. The appellate court erred in reversing the trial court's denial of a directed verdict in this case as the evidence showed that the CTA was acting as a common carrier at the time of the occurrence and the plaintiff was actually in the act, the specific act of alighting from the train at the time of the occurrence. Therefore, under long-standing Illinois law, the CTA owed the plaintiff a duty to provide a safe place to alight consistent with the practical operation of its business as a common carrier. The trial court properly submitted that narrow issue to the jury and the jury returned a verdict finding that the CTA breached the duty to provide a safe place to alight. In reversing the trial court's decision and the jury's verdict as well, the appellate court effectively avoided the common carrier's duty to provide a safe place to alight. There are two main reasons I believe that this was error. First, under the specific facts of this case, I believe the evidence showed that the common carrier's duty to provide a safe place to alight should have included an obligation to either avoid or remedy known dangerous conditions existing in the specific area of alightment. And this should have been true even if that happened to be naturally occurring ice. As long as the common carrier had sufficient notice of that condition and time to remedy it as was the case in this case. Isn't the concept of natural accumulation supported by the appellate courts of this jurisdiction? Judge, there are some decisions. In general, yes. When it comes to the specific duty a common carrier owes, the highest duty of care a common carrier owes to a passenger who's in the act of alighting from a train, I don't believe the appellate decisions of any of the districts, including the cases cited by the appellate court, Schaeffer, Cerritos, and Shoemaker, I don't think that those decisions necessarily mean that this case should not have proceeded to the jury. Those cases are all factually distinguishable from this case, and none of those cases overrule the Wasserman case, which I think is the closest case on point in this, and that would bring me essentially to my second point, and that is even if you find that there are no set of facts at all, ever, in which the common carrier's duty to provide a safe place to alight includes an obligation to avoid or remedy a known naturally icy condition in a specific area of alightment, the jury's verdict should still stand because the evidence showed that the CTA could have fulfilled that duty to provide a safe place to alight without engaging in any snow and ice removal. Therefore, the duty that was owed, the duty to provide a safe place to alight, cannot be voided by the application of the natural accumulation rule if you so choose to apply it to common carriers, and not just apply it to common carriers, but apply it to common carriers when they are, when they specifically have the highest duty to provide a safe place to alight. I think the appellate court, for all practical purposes, thought one had to avoid the other. The way they looked at the case. In this case, counsel, the trial court ruled that the CTA had no duty to remove the natural accumulation of ice. Is that correct? That's correct. And so this was premised entirely on the safe place to alight? The jury's verdict was premised entirely on the failure to provide a safe place to alight, correct. And what was the evidence that supported that verdict? Well, the evidence was that on the train platform there was an unsafe portion, and that was the area in which the plaintiff was made to alight, and there was a safe portion on the platform as well. And there was no evidence presented as to why the CTA simply could not have let her alight onto the safe portion of the platform. So the duty that went to the, the duty that the jury found was breached was specifically the duty to provide a safe place to alight. And that was after the trial court had applied the natural accumulation rule, which I submit to you was error in and of itself. I think that the CTA as a property owner can avail itself of the protections of the natural accumulation rule. But not in all circumstances. If a common carrier is in the specific act of providing a plaintiff a safe place to alight, and they are aware of a known dangerous condition in that specific area for several days before the incident, I submit that that duty should include avoiding or remedying that condition. Otherwise, the highest duty of care is rendered essentially meaningless in the face of the natural accumulation rule. But if the plaintiff had alighted from the train and she had reached a place of safety, so had she gotten off the train and she walked 10 or 15 feet or she had gone down the stairs and she was walking through the station lobby, let's say, and then she slipped and fell in a natural accumulation of ice and snow, I think under the current natural accumulation rule, then that would protect the CTA from liability in that instance. But in this case, we're talking about a plaintiff who... Was there evidence in the trial of how the place where the woman was alighting was made safe? Why it was safe? How it was safe? The other place? Where she, in fact, did step out. Was that the evidence where the sand and the salt was put down? No, just... In fact, the evidence was that there was no sand or salt put down whatsoever. The area... There was an eyewitness who testified... Actually, an eyewitness who was getting on the train, waiting for the train, and that eyewitness had... Was a DePaul student at the time and she would take that train three times a day and she would always get on the train in the same place. So she was standing on the platform when the train pulled in. As the train pulled in, the doors opened. The plaintiff stepped off the train very close in proximity to where this eyewitness, Ms. Majors, was waiting for the train, and she saw the plaintiff slip and fall on a sheet of ice which she testified was see-through, was so big that there was no way the plaintiff could have avoided it, could have stepped around it if she had seen it, and that it had existed in the same manner on that platform for three straight days, her having been in that specific place nine times in those three days. Would it be described as a natural accumulation of ice? It wasn't described as a natural accumulation of ice. The trial court directed a verdict on that issue. The evidence regarding sand and salt was the CTA's rail maintenance personnel testified that it was their job to continuously go on those platforms, and specifically for those three straight days, and whenever they encountered sand or, excuse me, whenever they encountered snow or ice on the platform, they would remove it completely and then spread sand on the platform from one end to the other. After they did that, there would be no procedure for removing the sand. So the absence of the sand coupled with the ice in that area existing in the same manner showed that the CTA had taken no steps in those three days. Well, there's no time limit, is there, to the natural accumulation rule? You mentioned a couple times the three days. Currently, Judge, yes. If you decide to apply the natural accumulation rule to the common carrier's highest duty of care in providing a safe place to light, currently under Illinois law, there is no time limit as to how long a condition is there. If you apply a straight natural accumulation rule, as Illinois has had, the time limit currently does not make a difference. But I submit to you in this case, when we're dealing with a higher duty of care owed by a common carrier, that that duty should include remedying a known dangerous condition in an area of alightment. But isn't that an end around to say that they have a duty to remove the natural accumulation? Yes and no, Judge. I think when you have an instance in which a common carrier or even a business inviter has a sufficient amount of time to remedy a known dangerous condition and the resources to do so, if it's in a specific area of alightment, they need to do that. And if we get back to the purposes behind the natural accumulation rule, I think this Court's decision in Graham v. the City of Chicago in 1931 was essentially that it would be unfair to compel the City of Chicago to remove ice and snow during an ongoing storm from all of its streets and sidewalks. That's not what we're dealing with here. And I think the case law that has developed over the years has shown a second rationale for the natural accumulation rule, and that is when it's snowing and when it's icy out, it's open and obvious. Everybody knows it. They turn on the TV, they see the weather, they walk outside, the conditions are coming down. That wasn't the case in this case. As the trial court pointed out, the evidence in this case was not that there was general icy conditions throughout the city. In fact, the plaintiff, who was 74 years old at the time of the occurrence, walked several blocks from her apartment building, got onto the train, the CTA's red light train at Howard Street, walked up those stairs, got on, no problem. She gets to Sheridan Road, and for whatever reason, the back end of that elevated platform, which happened to be near the lakefront, was covered with a sheet of ice, which had been there for three straight days. It was see-through. She couldn't have stepped around it, even if she had seen it, according to the eyewitness testimony, because it was that large an area. She takes one step in that few seconds that the CTA gave her to alight from the train, as we all know, those doors open up, and you've got to get on, or you've got to get off, or you've got to stay on. She was getting off at that stop. Unfortunately for her, that specific area was covered with this unreasonably dangerous condition, which happened to be known by the CTA, either known or should have been known by the CTA. As their testimony was, they were continuously checking that platform for safety, and specifically for safety from ice and snow. So I don't think the natural accumulation rule, as we have had it in this state, one necessarily applies to a common carrier's duty to provide a safe place to alight. I think the common carrier has that higher duty in the specific area of an alightment, even though a common carrier could theoretically take advantage of the rule if the plaintiff had alighted the train and reached a place of safety and was walking elsewhere on the common carrier's property. But also the reasons, the rationale behind the rule, and that was one of my problems with the appellate court's decision, was they didn't give me a rationale. Why should the natural accumulation rule apply in this instance? The CTA could have avoided this condition. They could have dropped her off somewhere else. They could have remedied the condition. In fact, the arguments of the CTA and the amicus brief are you can't make them liable for this because it will bankrupt them. I think they go as far as to say in the amicus brief that it would be the end of the public transportation system as we know it. That's simply not true. In this case, the evidence showed the CTA had multiple people assigned to the specific task of making sure that the platform was safe, and specifically safe from ice and snow. They were already paying these people to do this on these specific days, multiple people. The evidence in this case that made the condition which the injury occurred on unreasonably dangerous was the fact that they didn't do the job. They didn't do the job for those three days. So for them to say that if you impose an obligation of reasonable care to take reasonable measures when there is a known danger in an area of enlightenment would bankrupt the system is completely disingenuous and not supported by the record in this case. As I said, and I won't go into the evidence any further except if I'm asked to by the court, but the evidence clearly showed that that condition could have been not just remedied. So even if you're going to apply the natural accumulation rule to all common carriers, I believe the jury's verdict must still be affirmed. Even the appellate court recognized that the CTA was acting as a common carrier, and there was no dispute that the plaintiff was in the specific act of alighting from the train. In fact, the CTA's own reports, which were admitted into evidence, say the plaintiff was alighting from the train. She literally had taken one step off with one foot. She's coming off with the other foot. She slips and falls, and she breaks her leg. Under that set of facts, I don't think there's a dispute that the CTA owed a duty to provide a safe place to alight, consistent with the practical mode of its conveyance. In this case, after recognizing the duty, the appellate court says, well, we recognize the duty, but we're not going to let the jury decide whether or not it was breached. So even if you apply the natural accumulation rule, you still have the issue of whether or not the CTA could have complied with the duty to provide a safe place to alight without engaging in snow and ice removal. Counsel, will the court have to, if we follow your argument, have to overrule any of those appellate court cases that have held the natural accumulation rule would have protected them? I don't believe so, Judge, because the Scheffer case, which is the most recent case that applies the rule in a common carrier situation, number one, it's distinguishable. In that case, the plaintiff had alighted from the aircraft, and she had walked 75 yards across the tarmac, and she had walked onto a sheet of ice and snow herself. I submit to you, even though the court's decision in that case says that the plaintiff had not yet finished alighting, that, in fact, she had finished alighting. Secondly, the Scheffer case specifically discusses the Wasserman case and doesn't overrule the Wasserman case. In fact, that court specifically says in Wasserman, apparently, there was another place that they could have let her off, a place that wasn't covered with ice and snow, and therefore, that was a fact question for a duty, whether or not they should have let her off somewhere else. That's what the trial court ruled here. I believe he followed the Wasserman case and said, in compliance with Scheffer, that when there's evidence that they could have dropped her off somewhere else without engaging in snow and ice removal, they could have dropped her off at another place that was safe, well, then they should do just that. Also, the Wasserman case came down after the Cerritos case. And I would add, in Cerritos, there was evidence that it would have been inconsistent with the practical operation of its business as a common carrier to remedy that known condition. I mean, certainly there will be instances in which remedying an icy condition, a snowy condition, a slippery condition would be inconsistent with the practical operation of its business as a common carrier. If it had been an ongoing storm that caused the dangerous condition, well, the CTA is right. They can't be out there catching the snow as it comes down. So that would be one instance in which it's not consistent with the practical mode of operation. Another instance may be where a bus driver or a cab driver lets somebody off onto a sheet of ice, but that cab driver or that bus driver had no reason to anticipate that area was icy. I wouldn't ask this court to impose a duty on a bus driver every time he stops at a stop to get out of the bus, examine the area, make sure there's no snow or ice down there. That would be inconsistent with the practical mode of operation. But in this case, when we have the evidence that it was there for a sufficient amount of time, that they had actual or constructive notice of it, and they did nothing at all, I mean, a simple warning over the PA system could have complied with their duty to provide a safe place to alight in this case. Now, it's true that under the current case law, there's no obligation to warn of a natural accumulation. But in this case, we're not just dealing with a natural accumulation. We're dealing with a separate and independent duty, the duty to provide a safe place to alight. And a simple warning over the PA system, be careful as you're stepping off the train, may have done the job in this case. Maybe the jury would have found that was all they reasonably could have done. But under this case, the evidence was the CTA simply did nothing. They didn't try to remedy the condition, even though they had people assigned to do that. They didn't try to avoid the condition, even though that was certainly possible. All they had to do was pull the train under the platform, under the canopy, which was existing on the platform, and there was a safe place where she could have alighted down there. They didn't try to warn of the condition. They didn't do anything. So if you take the appellate court's ruling and strip it down to its core, basically what they're asking this court to say is that even when a common carrier, despite the highest duty of care in providing its passengers with a safe place to alight, doesn't have any obligation whatsoever to remedy known dangerous conditions that exist in the specific area of alightment, even if those conditions were known for three days, even if those conditions could have been easily remedied, and even if those conditions aren't open and obvious, as they weren't in this case, to passengers stepping off the train. Once again, I submit it would have been a different case if the icy conditions were generalized throughout the city, and then the plaintiff would have had a reason to anticipate that. But she did not. It seems to me somewhat circuitous. First of all, was the jury instructed that the CTA had no duty to remove the ice and snow? From the platform? I don't recall that specifically. What happened was the CTA had moved for a directed verdict on all issues, and the trial court granted a directed verdict on that issue. So I can tell you this. I was not allowed to argue that they should have removed the ice and snow from the platform. It was simply that after the verdict was directed on that issue, that was a nonissue in the case, and I think the trial court made it clear that that was not going to be an argument that I can make. Now, the CTA did make an argument to the jury that they did everything they possibly could, consistent with the practical operation of its business, to provide her a safe place to lie. The CTA made the argument that it was an ongoing snow and ice storm, and that they did engage in continuous snow and ice removal, and that they couldn't just avoid the naturally occurring ice condition by allowing her a different place to lie. They made those arguments in their closing. Without any evidence to support those arguments, the jury rejected those arguments. Therefore, I'd ask you to find. How do we know that the jury didn't find the CTA responsible for not removing the snow and ice? It was a nonissue in the case. But that's what you promised your whole argument on. Well, my argument is there's two. The duty to provide a safe place to lie is a separate and distinct thing than the non-duty to remove ice and snow. If, for example, the CTA allowed a passenger to alight from a bus in the middle of a speeding intersection, and then that passenger is hit by a, I'm sorry, if the CTA allows a passenger to alight in an intersection, in the middle of an intersection, and then that passenger steps off the bus, and that passenger is hit by a speeding motorist, it can be said that the CTA, you know, didn't comply with their duty to provide a safe place to alight. They still have no duty with regards to the underlying condition that was dangerous in that case, the speeding motorist. So there are two. But the only reason this place was not safe to alight was because it had snow and ice. Isn't that right? That would be true. And then if this Court should find that that triggers the natural accumulation rule and the protections that go along with it, that's not the end of the inquiry here because there was this other place. What the appellate court essentially done is taken the natural accumulation rule and said you don't only have no duty to remove the snow and ice, but even if, the natural accumulation rule can only shield someone from the failure to remove snow and ice. If they could have complied with the duty in this case by doing something else, by providing her a different place to alight, then the natural accumulation rule cannot void that liability. The natural accumulation rule is essentially a limited immunity granted to property owners who have this duty of reasonable care to maintain their property in a reasonable position. But that doesn't necessarily mean that just because an injury occurs on ice and snow, that it completely absolves the defendant from any other duties which were breached. So for that reason, I'd ask you to find that in this case, the duty included an obligation to remedy or avoid known dangerous conditions. And even if you don't find that, that the evidence showed the CTA could have complied with its duty by simply giving her another place to alight, which is exactly in line with the Wasserman case. Thank you. You may proceed, sir. Thank you, Your Honor. May it please the Court. My name is Steve Wood. I represent the Chicago Transit Authority in this appeal. Like Mr. Hansen, the Applebee's attorney in the prior case, I am also here before the Court for the first time. I only hope I do as good a job as Mr. Hansen did. Including the decision in this case that's up on appeal, there are five Illinois appellate court decisions that have directly addressed the conflict, the alleged conflict, or the interaction between the highest duty of care of a common carrier and the common carrier's safe place to alight with the natural accumulation rule. Could you speak up just a little bit, counsel? Excuse me? Could you speak up just a bit? Oh, I'm sorry. In none of those five cases has there been a dissent. No Illinois appellate court justice in any of those cases or in any other case has advocated the position that the plaintiff is taking in this case. And we urge the Court today to affirm that all property owners in this state are covered by the natural accumulation rule and that the common carrier's highest duty of care does not void that protection when the only danger, the only danger that the passenger faces is the natural accumulation of snow and ice. And that was the only danger that the passenger faced in this case. Are you familiar with the case, a recent Supreme Court case, Burger King v. Marshall? I think it's Justice Garment's opinion. And I look at that case in deciding whether the natural accumulation rule should apply. I think they're just competing policy considerations. The plaintiff maintains that it's not unreasonable. You point to the, I guess, the bank. It could bankrupt the system. In Burger King, the Court held that over and over dissent, it concluded that the business and banking nature of the relationship was such that the restaurant had the duty to protect its patrons from another patron's car crashing through its window. How do you square that holding with this case where we probably have a higher duty because it's public transportation? We agree that there is. There traditionally has been a higher duty of care applied to common carriers in this state. The third argument that we raised in our brief was that that's a historical anachronism that should be corrected. But notwithstanding that, there certainly is and has been applied that higher duty of care. Notwithstanding that, there's also a very long tradition of this Court since the 1930s to apply the natural accumulation rule to initially municipalities, and the CTA is a municipal corporation, but then extending it to business invitees and landlords. And it's because of the nature of the danger. The nature of the danger is weather. It's rain. It's snow. It's sleet. It's weather conditions that are, by their very nature, unpredictable. What was the nature of the relationship in assessing this competing policy in Burgundy? Yes, Your Honor. It was the business invitee who was owed a duty of protection, but the natural accumulation rule has since the 1930s held that there is no duty to protect against the weather. It's not just a matter of you have no duty to remove it. It's you have no duty to protect members of the public from weather conditions because by their nature they are completely unpredictable. And in addition, imposing that duty would overwhelm the resources of the defendant. As plaintiffs said, you know, if the duty was imposed, catching every snowflake that fell would not be a reasonable duty. How would you address the last point made by opposing counsel, that the interplay of the two duties or lack thereof, that I believe what he was saying at the end is, sure, okay, there's a natural accumulation at the normal stop, just stop a few feet ahead or where you know there isn't. Well, there are a couple of problems with that. One is that the facts in this case did not show that there was a safe place to alight. You know, when you try to bring these two rules together, you're using kind of different vocabulary, safe and unsafe versus natural accumulation or unnatural accumulation. What the evidence showed was that there was a canopy, a very small canopy on this platform that was less than 25 percent of the length of the platform and that there was no one-tenth of an inch covering of ice that had fallen from the sky. That was a natural accumulation under that canopy. There was absolutely no evidence in the record, although the train operator was called to testify, that the train operator had any ability at all to safely provide a place to alight under that canopy for an eight-car L train. Okay, she was in the fifth car of an eight-car train. There's absolutely no evidence that the train operator even has the ability to electronically open one, two, three car doors, some other car doors. The trial court judge surmised that it was possible to make an announcement in the train and direct people within the train cars crossing over various cars to get to the place under the canopy to alight. But again, there's no evidence that that was even possible, and there's certainly no evidence that that would have been a safer means than the means that was provided in this case. And the means that was provided in this case was that during an ongoing storm, she alit, she deboarded the train onto a platform that had natural accumulations of snow and ice. Plaintiff's counsel for the first time in the PLA and also in the opening brief in this case makes the argument, the factual argument, that there was no ongoing storm. Yet certainly we can see that the facts should be seen in the light most favorable to plaintiff and all reasonable inferences should be granted. But that's just simply a spin, an unfounded spin on these facts. Plaintiff's main witness in this trial, Patricia Majors, took the stand and testified. She's the only person who, two years and nine months after the incident, had a specific memory of what the weather conditions were like on the two days prior to this fall and what the platform conditions were like two days before this fall. And her testimony was that it had been raining and sleeting and there was falling slush from the sky for all three days. That when she walked from her apartment to the Sheridan L stop, she walked on sidewalks that had accumulations of slush and snow on them and ice over the tops of her boots. But when she got up to the platform, there was no slush, there was no snow, there was nothing on the platforms except a very thin one-tenth of an inch layer of ice. There was an ongoing storm. It had continued to that morning, and clearly, if the accumulations on the streets and sidewalks were over an inch and over the tops of her boots three times a day as she was walking to the L stop, which was what her testimony was, then there was an ongoing storm. And something or someone was removing that several inches of accumulation off of the CTA's L stop, off of the CTA's exposed platform. So she clearly testified that there was an ongoing storm, that there was accumulation that had been removed from that platform, and that on the morning of this incident, the ongoing storm continued. She testified that it was raining and that when plaintiff fell, she took off her coat to hold it over the plaintiff to prevent her from getting wet. Another witness testified that it was snowing and that the woman, the other witness, opened up her umbrella to protect the plaintiff from the downfall of the snow. Mr. Woods, your argument now for the last several minutes is all based on facts, evidence that was presented arguably at trial. We're not here to decide fact issues. How was, I mean, was the jury misinstructed on the law? Is that what you're really getting at? Because those facts would be decided in this case, a jury case, by the jury. My argument is that the case is being spun, the facts are being spun in a way to suggest that it's a different kind of common carrier, highest duty of care, natural accumulation case. And the facts, I'm contending, simply don't support that, even if we take the facts in the light most favorable to plaintiff. But in our view, it is a duty case. In our view, it's not necessarily that there was an improper instruction, because the step where the duty should have been decided was at the directed verdict stage. But getting to Justice Garmon's question, this jury was told absolutely nothing about anybody's duty to, with respect to the natural accumulation of snow and ice. The only duty that the jury was instructed on was that the CTA owed the highest duty of care in providing a safe place to alight for this passenger. Was there a definition about what does safe mean on the duty to CTA? I mean, is it safe to have broken floorboards? Is that what they have to do, is that their duty? Or are they trying to put into the duty removal of ice, removal of snow, things like that? Well, because it was left unstated, the jurors certainly could have concluded, and really because of the evidence in this case, the only unsafety, the only danger allegedly that the plaintiff faced on alighting where she alit was the existence of naturally accumulated snow and ice. And there simply was no direction, no instruction at all on that issue. I mean, what plaintiff is saying is that the judge took that issue away from the case, but that doesn't mean that the jury knew that or knew that the basis for why that issue was taken away from the case. So no definition of what the duty was with regard to the CTA in making it safe to alight? Making it safe to alight and, more specifically, whether the existence of a natural accumulation of snow and ice made it unsafe. If there was a legal duty on the CTA with respect to protecting the plaintiff from that ice, removing that ice, or anything else. Were there any evidence at trial that showed that CTA may have assumed the duty to remove natural accumulations? That was never an issue in this case. Plaintiff has never argued it at the trial level, at the appellate level, or at this case, that there was some kind of assumed duty. And I don't think the case law would support the idea that the CTA assumed a duty with respect to those passengers. It's simply not an issue that's been litigated in this case. Are you saying the CTA did not have a crew to clean away snow at stations? Well, the evidence is there was a single person who was assigned to three locations on that, on an eight-hour shift, and depending on how bad the snow was, would move at certain times to certain stations and would get there before or after certain periods. They started at 5 a.m. at the Addison stop. Is this under the private contract that's in dispute now? Say it again? No, I'm sorry. This is a CTA employee. This was not a third party. So it has nothing to do with what we've been hearing about in the news. So this is a single employee who was at the Addison L stop at 5 a.m. clearing both platforms, had then gone, I think, to the Clark Junction, which is an important operations location, and then his third assignment was at the Sheridan L stop. My assumption is that he made it to the Sheridan L stop before plaintiff alighted, if you believe Patricia Major's testimony, that there was no more snow or ice on the platform, yet when she walked to the platform that day, she was walking through an inch of accumulation on the streets and sidewalks. But there's no evidence that he got there one way or another. But if the duty is going to be imposed on the CTA, then it's not going to be sufficient for the CTA to provide a single person for two or three locations. It's going to be required that the CTA provide a crew at each station. And as soon as natural accumulation starts falling, the CTA needs to address it, because if somebody falls on a natural accumulation in the location where they were alighting, under plaintiff's theory, the CTA is going to be liable. But that also merges, then, the duty of natural accumulation removal. That would mean that the CTA does have it. It would really be the only way to protect itself from liability would be to remove that natural accumulation. And again, the natural accumulation rule doesn't just apply to snow and ice. It applies to rain. It applies to water. If there's an allegation that the wooden boards on the platform were slippery because it started raining, how does the CTA protect itself from that kind of a claim? Again, the five appellate court decisions in this case that have been issued all unanimously have agreed that imposing that kind of a burden on a common carrier like the Chicago Transit Authority would be an overwhelming burden and that there would be no justification for that. Common carriers are entitled, just as any other property owners are, to the protections of the natural accumulation rule. I guess I can still get back to my question. Hasn't the CTA, in effect, assumed that duty by its operation? My understanding, and again, I haven't gone deeply into these cases because it simply hasn't been raised by the plaintiff. The plaintiff has never asserted that argument in this litigation at any point. But my reading of those cases is that they typically arise in the context of landlord-tenant. And was it a part of the duty? Was it a part of the tenancy contract that the landlord was going to take care of that? Or you've got an owner who third parties in somebody to clear the parking lot and they don't do a good job. That's very different from what we have in this case. And again, plaintiff has not argued that. And what we have here is just the straight application of the natural accumulation rule. And the corollaries to those rules are that there's not a duty to remove snow and ice. There's not a duty to remove naturally occurring ice that exists beneath the snow. And the basis for liability for a defendant property owner is if they cause or aggravate the accumulation. And in this case, the trial court judge held that there was absolutely no evidence that the CTA did anything to cause or aggravate. This was not an unnatural accumulation. That was a ruling against plaintiff below. That was not challenged on appeal to the Illinois Appellate Court. It's not, as far as I know, not challenged in this court, although I heard something that made me believe that possibly that was now part of plaintiff's argument. But that was decided adversely to plaintiff and has not been raised since. And again, there is no, even if we were looking at the record fresh, with fresh eyes, there would be no evidence found in this record to suggest that the CTA caused or aggravated this condition. Mr. Woods, back to my earlier questions about instructions. And I may not be following you correctly, so forgive me, but I thought you said the jury was kind of left without proper instructions. I think you said something to that effect. Is that right? Given how the trial court judge construed the duties. Okay. Well, then, all right. Then let me ask you this question, because the reason I was asking is based on my notes. I pulled out the brief. The bottom of 21, it says, in fact, in this case, the jury was instructed that the defendant's duty was limited to use the highest degree of care consistent with the mode of conveyance used and the practical operation of its business as a common carrier by the rail. First, was that an instruction that was given? That was the instruction given. And was there an objection to that instruction? There wasn't an objection to the instruction. There wasn't, I'm sorry. There was not an objection to that instruction. There was an objection to that instruction being provided as the only duty instruction without instruction, without telling the jury. Let me back up. I'm not sure at that point in the litigation, which was an hour or two before the jury was instructed, because this whole notion of what the duty was, what the proper duty was, was all sort of being debated and decided as the evidence was coming in, as the witnesses were testifying. The directed verdict issue was really raised for the first time after plaintiff's case. There was only one more witness. And in the context of trying to debate and figure out what those issues were going to be, the trial court judge took the snow and ice duty, the duty to remove snow and ice, out of the case. But the jury was not instructed about any duty that the CTA had or did not have with respect to snow and ice on that platform. And when the sole danger, when the sole issue is that plaintiff faced is falling or slipping on the snow and ice, it's a problem with the jury instructions. It's a problem to say, oh, the jury decided that issue already, if the jury was never instructed on the duty. And it was really the trial court's failure to properly get that duty analysis right that is our intention on appeal. In addition to the duty analysis, we also raised causation as a second argument in our case. We feel that in addition to failing to establish duty, plaintiff in this case, by means of her medical expert, did not establish causation. The medical expert took the stand and really testified very clearly that the climate issue here, the ice issue here, had nothing to do with her injury. Her injury occurred because she had osteopenia in her lower leg. She was an elderly woman who had a history of smoking and cardiac issues. And when she took a step off of this train, according to her medical treater, her foot planted. It didn't slip on the ice. And no one says that they saw plaintiff slip on the ice. There's some hearsay. There's some I was told this kind of thing. But even Patricia Majors, who witnessed it, contrary to what plaintiff's counsel just said, she didn't testify I saw her take a step, slip and fall. She said I saw her step off the train and fall. Was there any special interrogatories, counsel, that were given? There were no special interrogatories offered in the case, no. So in addition to the causation issue, we asked in our brief also that this court address an issue that has not been addressed in the court for many decades, which is the whole notion that the common carrier owes a highest duty of care as opposed to an ordinary care under all the circumstances, as opposed to an instruction of care that the greater the danger to which a passenger might be exposed, the greater the duty of the common carrier. But it is not always and forever in every case the highest duty of care. If there are no further questions, I'll conclude by asking the court to affirm the decision of the appellate court, which reversed the trial verdict in plaintiff's favor, and we ask the court to hold that common carriers are protected by the natural accumulation rule and do not owe duties to passengers to provide a safe place to alight if the sole danger that the passenger faces is a natural accumulation of snow, ice, or water. Thank you. I just want to, I think, touch upon an issue that was brought up. The CTA never asked for any type of special instruction. They never asked for any type of limiting instruction or special instruction. They asked for a directed verdict under the natural accumulation rule, and that's what the trial court gave them. After the trial court directed a verdict on that issue. Let me ask you this, Mr. Ryan. Was there any evidence in this case that there was another portion of the platform that could have been utilized that would allow for safe ingress and egress of the duty to alight, safe duty to alight? Yes, I believe there was. And that was the portion that was underneath the canopy. Contrary to what counsel just said, there wasn't, first of all, the train operator didn't testify, even though I had a 237 notice against him for him to come. He never came to court, so I was stuck with choosing between a 501 instruction for a missing witness and the trial counsel's offer to read his portions of his discovery deposition. I had to make a choice on that. He never showed up to testify, and neither did the train station operator. So just for what that's worth. But there was evidence that there was a safe portion of the platform, namely the portion of the platform that was covered by this canopy, and there was no evidence presented as to why the CTA could not have allowed the plaintiff to alight under a plainly visible canopy. Counsel, was there evidence that the rest of the train passengers could have alighted in a safe way as well? I'm not sure I understand your question, Judge. I think you mentioned there were eight cars in the train. Now, if the conductor actually moved the particular car, the fifth car that the plaintiff was in, further to be under the small canopy, would all the other passengers, again, have places of safe alignment? Was that alightment? Was there any evidence of that? There was no actual testimony there was an eight-car train. There was no actual testimony that the plaintiff was on the fifth car. There was no testimony that the entire train could not have fit under the platform, and there was no testimony that – So that's not in the record? No, that's not part of the record. And that gets back to my point. Once you recognize the duty, and the duty in this case, once again, is to provide a safe place to alight. Once you recognize that duty, everything else becomes a question of fact. The trial court – and maybe my position wasn't clear. My first argument is that the trial court erred by applying the natural accumulation rule in this case, because under the specific facts of this case and the highest duty of care to provide a safe place to alight, the trial court should have found that that duty to provide a safe place to alight included an obligation to avoid or remedy known dangerous conditions which were known for three days. But my second position is, even if you don't believe that, that the jury's verdict must still be affirmed, because after the application of the natural accumulation rule, a duty to provide a safe place to alight still existed, and the natural accumulation rule itself can't operate to relieve the CTA of that duty completely. The natural accumulation rule can only – a property owner has no obligation to remove natural accumulations of ice and snow. In your initial argument, you talked about public policy. I mean, if we were to rule on the second issue, the duty to provide safe alightment, regardless of the natural accumulation rule, every train – I mean, every engineer on every train is going to have to know every inch of every platform and is going to have to stop everywhere to find that one spot when there's a natural accumulation of ice and snow, water or snow, to allow safe ingress and egress for every passenger getting onto a train, right? I mean, that's basically where we're left. I disagree with that, Your Honor, respectfully. The duty is to provide a safe place to alight. And that duty, as evidenced by the IPI instructions, is limited to the consistent operation of the business as a common carrier by rail. So if it is impractical – and I said that earlier – it would be impractical to require a bus driver to get off the bus and look around and make sure that everything is safe. Same thing for a train operator. Unless the train operator or the CTA already has actual or constructive knowledge of the dangerous conditions, if they're aware of the conditions and they do nothing to avoid them when they can, what message does that send to common carriers throughout the rest of the state? And that's where the two duties or lack thereof merge. The appellate court ruled – and we've been talking about the trial court – the appellate court ruled that the natural accumulation rule takes priority, that there's absolutely no duty on the part even of a common carrier to remove, knowing it or not, a natural accumulation of snow and ice. Go ahead. Correct. That's what the appellate court ruled, and I think that was an error. Under the specific facts of this case – and I'll talk more about that in a second – secondly, when the evidence shows that you can fulfill the obligation without engaging in snow and ice removal, the natural accumulation rule cannot shield you from that other liability. It just can't. And then it becomes, much like in the Marshall v. Burger King case, a question of fact for the jury to decide. If the CTA had presented the evidence, which counsel is up here talking about, that it would have been impractical, that it would have been impossible with the consistent operation of the train to allow the plaintiff to get onto that safe area, then a summary judgment or a directed verdict should have been granted. But there was no reason that they could not have just let her out in a safe place. Absolutely no reason whatsoever. Getting back to the policy arguments, I just point out that the legislature has specifically exempted common carriers in general and specifically the CTA from the Tort Immunity Act and the ice and snow provisions under the Tort Immunity Act. And I submit to you that's a recognition of the higher duty of care that a common carrier owes. Again, one does not have to trump the other. A common carrier can still have a duty to provide a safe place to alight, which it's true that that's limited to the consistent operation of its business, and afford protection from the natural accumulation rule. If she had already alighted the train and under the Cadme case had reached a place of safety and then she slipped and fell on ice, well, yeah, the natural accumulation rule should have shielded the CTA from liability. But the higher duty of care owed by a common carrier to somebody who was alighting doesn't get voided by the natural accumulation rule. Just like the Marshall case, once you recognize that duty, it becomes a question of fact for the jury to consider whether or not that duty was complied with. In this case, that's exactly what happened. The trial court allowed that very narrow issue to go to the jury, and the jury found you breached it. With respect to proximate cause and the other. They weren't told, if they were not told, were they, that if you believe that it was a natural accumulation of snow and ice that violated the duty of ingress alightment, for lack of a better term, that your verdict should be for the defendant, right? They were not, the directed verdict was made on the natural accumulation of snow and ice without the jury knowing that if their finding was that the breach of the duty by the CTA was not to clear that snow and ice, that they're still defined for the defendant. That's correct, Judge, and the CTA didn't ask for that type of instruction. I just heard them say they did ask for another duty instruction. I submit that, read the record, it's not in there. With all due respect, I was trying to counsel. Counsel was not. You will not find that in the record. But putting aside that issue. There is another issue, whether the judge had a responsibility sui sponte after the directed verdict to make sure that the jury was aware of it. Well, the issue still goes to the jury whether or not the CTA fulfilled the duty to provide a safe place to alight, because they could have allowed the plaintiff to alight into a different area without engaging in snow and ice removal. And that was the issue that went to the jury. And if you read, and I quoted. Your position, counsel, is that your verdict is not in peril? That you could lose this argument and still be successful in affirming the judgment of the lower court? Yes, Judge. The first argument, if I lose on the first argument, I believe the verdict should still stand, because the duty to provide it. Once you recognize the special relationship, there is that duty. That duty is a question of fact for the jury. The trial court already applied the natural accumulation rule to the case. The CTA already got the protections of the natural accumulation rule. My first argument is that they shouldn't even have gotten that. But even if you find that they should have gotten those protections, then the second argument is, yes, I still think the verdict should be affirmed, because the issue that was submitted to the jury and decided upon the jury was that narrow, very narrow issue of whether or not the CTA provided a duty to provide a safe place to alight. And the jury returned a verdict in favor of the plaintiff on that issue. What would you prefer that our order look like, read like in this case? I'd prefer that you abolish the natural accumulation rule completely, Judge. But, no, in all. It's serious now, because it's. I would prefer that you recognize that the common carrier's higher duty of care under this specific set of facts, which I submit to you is a very unique set of facts. It's not often that you have eyewitness testimony that somebody saw a condition for three days straight. And counsel made some comments about Ms. Mader's testimony. She testified the reason she remembered the condition so clearly and that it was the same was she couldn't believe that they didn't do anything about it. She said they usually do clean it up. For this three days, for whatever reason, they didn't clean it up. That was the dangerous condition that the plaintiff fell on. So to get back to your question, I would like the order to show that when a common carrier has knowledge, actual or constructive, of a dangerous condition in a specific area of alightment, that they do, as a common carrier, have a duty that's limited to be consistent with the practical operation of its business to remedy that condition. Alternatively, I'd like the order to read like the Wasserman case, saying that even after the natural accumulation rule was applied to this case, there still existed a duty to provide a safe place to alight because of the evidence showing that that could have been fulfilled without engaging in a natural or removing in snow and ice removal. And therefore, a jury question existed on that issue, which the jury in this case answered. Thank you, counsel. Thank you, Judge. Thank you. Case number 108-888.